**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Petitioner,<br><br>v.<br><br>STANLEY BLACK & DECKER, INC.,<br><br>Respondent. | No. 1:19-cv-02599-CCB |

**EEOC'S REPLY TO RESPONDENT'S RESPONSE IN OPPOSITION TO
EEOC'S PETITION FOR ENFORCEMENT OF ADMINISTRATIVE
SUBPOENA AND REQUEST FOR HEARING**

The Equal Employment Opportunity Commission ("the Commission" or "EEOC") herein replies to Respondent's Response in Opposition to the EEOC's Petition for Enforcement of Administrative Subpoena and Request for Hearing (ECF No. 4, hereinafter "Opposition").

**A.   Respondent's Bad Faith Arguments are Meritless.**

Respondent devotes much of its Opposition trying to convince the Court that the EEOC is engaging in bad faith conduct, even going as far as to accuse the EEOC of intentionally failing to identify the existence of another pending charge against Respondent ("the Felters Charge"). Given that the Felters Charge does not form the jurisdictional basis for the Subpoena issued pursuant to EEOC's ADEA Directed Investigation, the EEOC had no reason to address it in its Petition. Moreover, the Felters Charge, now disclosed by Respondent, alleges violations under Title VII of

1

the Civil Rights Act of 1964, as amended ("Title VII"); the Americans with Disabilities Act of 1990, as amended by the Americans with the Disabilities Amendments Act of 2008 ("ADA"), and the Genetic Information Nondiscrimination Act of 2008 (GINA).  Thus, the EEOC would have violated the confidentiality provisions of those statutes in disclosing the charge as part of its Petition.[1] *See, e.g.,* Title VII § 706(b), 42 U.S.C. § 2000e-5(b) ("Charges shall not be made public by the Commission."); Title VII § 709(e), 42 U.S.C. § 2000e-8(e) ("It *shall* be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year.") (emphasis added).[2]

Respondent's decision, to make the Felters Charge public,[3] does nothing to show that EEOC has engaged in bad faith.  Indeed, the history and documents cited by Respondent show the contrary and instead justify the EEOC's decision to initiate an ADEA Directed Investigation to address the EEOC's systemic concerns. As Respondent's exhibits show, when the EEOC sought the identity of employees at any of Respondent's facilities who received a release similar to the severance waiver received by Felters ("Respondent's Waiver"), Respondent objected, arguing that

---

[1] Although the Felters Charge also alleged violations under the ADEA and the Equal Pay Act of 1963, as amended ("EPA"), which have no confidentiality provisions, the EEOC still must respect the confidentiality provisions of the other statutes.

[2] *See also*, 29 CFR § 1601.22 ("Neither a charge, nor information obtained during the investigation of a charge of employment discrimination under title VII, the ADA, or GINA, nor information obtained from records required to be kept or reports required to be filed pursuant to title VII, the ADA, or GINA, shall be made matters of public information by the Commission prior to the institution of any proceeding under title VII, the ADA, or GINA involving such charge or information.")

[3] By making the Felters Charge public, Respondent has expressly waived the confidentiality protections afforded to it by Title VII, the ADA and GINA.  Given this express waiver, the EEOC is now addressing the Felters Charge.

"the information sought [was] irrelevant and beyond the authority of the EEOC to seek in connection with Mr. Felters' Charge." ECF No. 4-6 at 3, Def's Nov. 16, 2018 Letter. Based on this objection, the EEOC attempted to persuade Respondent of its authority to investigate claims beyond the Charging Party and informed Respondent of its intent to conduct a nationwide investigation. ECF No. 4-7, Nov. 28, 2018 Rhodes Letter. The EEOC's efforts, however, were unsuccessful, and Respondent continued to object to the temporal and geographic scope of the EEOC's investigation, arguing that the Felters Charge did "not provide the EEOC with free reign to obtain information that may or may not be relevant to potential charges of Stanley employees in other states." ECF No. 4-9 at 4, Def's Dec. 10, 2018 Petition to Revoke or Modify.

Since the Felters Charge was also filed under the ADEA and the EPA, had the EEOC truly wanted to evade the narrower relevancy requirement as Respondent argues, the EEOC could have at this time simply issued a subpoena under the ADEA and/or EPA. Instead, the EEOC considered the other investigative tools available to it to investigate systemic issues, such as the initiation of directed investigations under the ADEA or the EPA, or the filing of a Commissioner's Charge. Such tools are particularly appropriate when, as happened here, the EEOC "learns of a problem or there is reason to believe that discrimination may be more widespread or of a different nature than an individual charge alleges." *Advancing Opportunity: A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission* (July 7, 2016).[4] It was entirely reasonable for the EEOC to believe that the Waiver issued to Felters was not a mere company anomaly, but rather an ongoing practice by Respondent to deter its employees from filing charges of discrimination and cooperating in EEOC investigations.

---

[4] *See* https://www.eeoc.gov/eeoc/systemic/review/.

3

Faced with Respondent's objections regarding the expansion of EEOC's investigation into individuals other than the Charging Party, and the EEOC's ongoing concern that Respondent was issuing releases that did not comply with the ADEA (in particular, the Older Workers Benefit Protection Act of 1990 ("OWBPA") which protects employees who waive their right to sue[5]), the EEOC elected to initiate a directed investigation under the ADEA against Respondent.  The EEOC thereafter properly tailored its Subpoena, and its arguments to support it, to the ADEA Directed Investigation.  In doing so, the EEOC elected to confine its systemic investigation to the ADEA. EEOC's tactical decision to proceed with an ADEA directed investigation was entirely within EEOC's discretion and hardly evidence of bad faith.  It was also reasonable for EEOC to be concerned about the specific impacts of the release on older workers, given the unique contours and enforcement mechanisms of the ADEA, as amended by the OWBPA, discussed more, *infra*.

That EEOC's ADEA Directed Investigation may have originated from another charge is also immaterial.  There is nothing in the statute or the ADEA's regulations which prohibit the EEOC from utilizing information obtained from one charge to initiate a directed investigation under the ADEA.  On the contrary, as the Supreme Court has made clear, "the EEOC's role in combating age discrimination is not dependent on the filing of a charge*; the agency may receive information concerning alleged violations of the ADEA 'from any source,'* and it has independent authority to investigate age discrimination." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (emphasis added); *see also Am. & Efird Mills,* 964 F.2d 300, 304 (4th Cir. 1992) (unlike Title VII, existence of a charge not required under ADEA); 29 C.F.R. §§ 1626.4, 1626.16. The EEOC also requires no threshold showing of suspicion before it can exercise discretion in

---

[5] OWBPA amended the ADEA, including specific requirements for an employee to properly waive an ADEA claim.

4

initiating and conducting investigations to ensure workplace ADEA compliance. 29 C.F.R. 1626.4 ("The Commission may, on its own initiative, conduct investigations of employers . . . pursuant to sections 6 and 7 of the Act.").

Respondent attempts to raise the specter of improper agency overreach, but it provides no actual evidence to support its allegation of bad faith. Respondent's reliance upon *EEOC v. Michael Const. Co.*, is misplaced since in that case the court found that the agency operated in *good faith*, noting that obtaining settlement was only part of the motivation behind its pursuit of the investigation, and observing that allowing the company to limit its responses to EEOC's subpoena "would seriously hamper the EEOC in making an independent determination on reasonable cause." 706 F.2d 244, 251-52. The court in *Performance Food Group*, similarly permitted EEOC to use data obtained in response to an EPA subpoena in furtherance of an investigation expanded to include Title VII allegations, finding no bad faith on the part of the agency. No. MJG 09-2200, 2010 WL 11570678 (D. Md. Feb. 18, 2010) at 4. As for *EEOC v. McLane Co., Inc.*, there the district court expressed concern that the EEOC provided no rationale for why it sought information for individuals who lacked standing, due to their age, to bring an ADEA claim, nor why it sought specific information entirely unrelated to the subject matter of ADEA claims, such as employees' social security numbers and genders. No. CV-12-16-PHX-GMS, 2012 WL 1132758, at 7 (D. Ariz. Apr. 4, 2012). Ultimately, the court required the employer to produce information that clearly related to the subject matter of an ADEA claim and was not unduly burdensome and agreed to hear EEOC's rationale for requesting other data, *in camera*, while preserving the agency's deliberative process privilege. *Id.* at 5 n. 5, 7. The instant matter is distinguishable from *McLane*, insofar as the EEOC has not requested the same scope of "pedigree" information outside the subject matter of an ADEA claim, such as the sex or social security numbers of Respondent's employees, and it

5

*has* provided a rationale for its inquiry. While narrowing the scope of the Subpoena in this matter by age (and by extension, standing under the ADEA), as the court required in *McLane*, *id.* at 3, could have the effect of making the data more relevant, it could also have the effect of requiring Respondent to pre-parse the data more thoroughly, potentially increasing Respondent's burden, discussed *infra*.

        **B.**      **It Would Be Reversible Error to Apply Title VII Relevancy Standards to an ADEA Subpoena.**

Respondent argues that because the EEOC initially uncovered Respondent's Waiver during the Felters investigation, then the Court must "harmonize" Title VII and the ADEA or only enforce the Subpoena under Title VII's relevance standard. As discussed above, there is nothing in the statute or the ADEA's regulations which prohibit the EEOC from utilizing information obtained from one charge to initiate an ADEA directed investigation. More importantly, the Supreme Court has consistently rejected such a harmonization argument, noting that when conducting statutory interpretation in areas where two statutes are "materially different," the courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) (citing *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). Because EEOC's subpoena authority under the ADEA differs materially from its authority under Title VII, it would be improper to harmonize the two statutes.

This case is distinguishable from *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642 (7th Cir. 1995), cited by Respondent, where, as Respondent notes, there were overlapping violations of Title VII and the ADEA within a single investigation. In that case, there was no suggestion that the ADEA could or should stand alone. Here, only one statute is at issue in EEOC's ADEA Directed

6

Investigation, and the EEOC launched that narrowly tailored investigation so that the question of whether Respondent violated the ADEA does indeed stand alone. Other than the EEOC learning of the existence of Respondent's Waiver during the Felters investigation, his charge and his investigation are entirely irrelevant to the EEOC's ADEA Directed Investigation; therefore, so too are Respondent's concerns about violations of the Reorganization Act and the geographic and temporal scope of the Subpoena. *See EEOC v. Randstad*, 685 F.3d 433, 451 (4th Cir. 2012) (declining to limit geographic or temporal scope of subpoena where courts must "defer to the EEOC's appraisal of what is relevant so long as it is not obviously wrong") (citation omitted). While Respondent asserts that the Subpoena "still remains rooted in and integral to the Felters' investigation," and that EEOC seeks to conceal that fact, *see* Opposition at p. 6, Respondent provides no evidence to support this assertion, beyond baseless speculation, and the EEOC affirms to the Court that it has no intentions of using information obtained during the ADEA Directed Investigation for purposes of the Felters investigation.

### C. It Would Be Reversible Error to Turn This Summary Proceeding into a Trial on the Merits.

As the EEOC anticipated in its Petition, Respondent ignores overwhelming precedent that subpoena enforcement proceedings should be summary in nature and involve only limited review. *See McLane Co., Inc. v. EEOC*, 137 S.Ct. 1159, 1165 (2017), as revised (Apr. 3, 2017) (citations omitted) ("we have twice explained . . . [a] district court is not to use an enforcement proceeding as an opportunity to test the strength of the underlying complaint"); *EEOC v. Maritime Autowash, Inc.*, 820 F.3d 662, 665 (4th Cir. 2016) (citation omitted) ("The district court plays a 'limited' role in the enforcement of administrative subpoenas . . . . [and] courts should look only to the jurisdiction of the agency to conduct such an investigation."); *see also Randstad,* 685 F.3d at 442

7

(citation omitted) ("A district court's role in enforcing administrative subpoenas is sharply limited."). Respondent instead pushes for a trial on the merits, arguing that EEOC lacks any plausible claims for which relief might be sought. Such an argument is contrary to the Fourth Circuit's admonishment that venturing "prematurely into the merits of employment actions that have not been brought . . . would be reversible error." *Maritime,* 820 F.3d at 667 (quoting *Randstad,* 685 F.3d at 449 (quoting *EEOC v. Shell Oil,* 466 U.S. 54, 72 n. 26 (1984); *EEOC v. United Air Lines, Inc.,* 287 F.3d 643, 651) (internal quotation marks omitted).

While a merits review is improper at this stage, based on the Waiver language alone, EEOC can already articulate several plausible claims for which relief might be sought as a result of information obtained during a directed investigation. This is important, as Respondent incorrectly avers that the Subpoena is invalid because "the only harm alleged" in the EEOC's ADEA Directed Investigation "is 'facial retaliation' in merely offering the release." *See* Opposition at 24 n. 14. On the contrary, as EEOC stated in its notice, the ADEA Directed Investigation "will specifically focus on [Respondent's] requirement that discharged employees sign a waiver releasing their rights to file any charges with the EEOC in exchange for severance pay. This requirement is facially retaliatory *and* interferes with employees' rights under the ADEA." ECF No. 4-10 at 5, EEOC's Dec. 4, 2018 Letter (emphasis added).

> *(1) EEOC Contemplates Plausible Facial Retaliation Claims, Even If the Law Remains Unsettled in the Fourth Circuit.*

Facial retaliation is only one of several plausible claims for which EEOC might seek relief as a result of information obtained from enforcement of the Subpoena. An employer that has offered additional severance benefits in exchange for an employee's promise not to file a discrimination charge or participate in an EEOC discrimination proceeding has committed facial

8

retaliation. *See EEOC v. Lockheed Martin Corp.*, 444 F.Supp.2d 414, 420-21 (D. Md. 2006). Such promises have a chilling effect on workers' free exercise of their rights, particularly given economic workplace realities, and particularly for vulnerable older workers. As the Sixth Circuit explained, "An employer cannot purchase a license to discriminate." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 585 (6th Cir. 1995) (citation omitted). As expected, Respondent relies upon *EEOC v. Nucletron Corp.* for the proposition that facial retaliation is not a valid theory of violation. *See* 563 F.Supp.2d 592 (D. Md. 2008). Respondent argues that because the *Nucletron* decision followed the Sixth Circuit's reversal of the lower court's holding regarding facial retaliation in *EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490 (6th Cir. 2006), and the *Lockheed* decision predated that reversal, the law is settled in the Fourth Circuit, such that facial retaliation "has been overwhelmingly rejected as a notion not even remotely justifiable." Opposition at 18-19. This mischaracterizes the current state of the law. While the *Nucletron* court declined to follow the *Lockheed* court's reasoning, based on its view of the Sixth Circuit decision in *SunDance*, nothing that could be described as binding precedent has been established in the Fourth Circuit.

Respondent's reliance upon the unpublished opinion in *David v. Winchester Med. Ctr.*, 759 F. App'x 166 (4th Cir., Jan. 11, 2019), as evidence that the "Fourth Circuit itself rejects EEOC's position," *see* Opposition at p. 19, is similarly unavailing. In addition to not being binding precedent, the *Winchester* opinion merely stands for the proposition that an employee has no adverse action taken against her when she refuses to sign a separation agreement following her termination, and her employer declines to initiate further severance negotiations. *See* 759 F. App'x at 169. Nothing in the opinion suggests that the agreement in *Winchester* contained the type of waiver provisions with which EEOC takes issue. Nor is the offering of a severance agreement even alleged to be the retaliatory act in that case—instead, it is the employer's refusal to negotiate

9

that comprises the alleged retaliation.  *See id*.  Indeed, the *Winchester* opinion does not even contain the phrase "facial retaliation."  *See generally id*.

    *(2) EEOC Contemplates Other Plausible Claims of Actual Retaliation.*

Even the Court in *Nucletron* recognized other plausible ways in which a waiver like Respondent's Waiver could result in workers being subjected to retaliation.  Thus, independent of whether the Fourth Circuit settles the doctrine of facial retaliation, the information obtained by enforcement of the Subpoena would support the Commission's ADEA Directed Investigation into what could be a panoply of plausible ADEA violations under more established theories of retaliation.

The *Nucletron* Court contemplated several hypothetical scenarios in which an employer, having used an agreement like the Waiver, could interfere with employee rights in a retaliatory manner that would not require addressing the merits of the facial retaliation theory.  For instance, the Court noted that an employer commits retaliation if it "either (i) attempts to enforce the agreement against an employee who signed the agreement but nevertheless files or participates in an EEOC charge, or (ii) withholds benefits already promised or owed from an employee who refuses to sign the agreement."  563 F.Supp.2d at 595.  The *Nucletron* Court went on to classify as unquestionably retaliatory scenarios: (1) in which an employer revoked benefits that were part of the severance package promised to all terminated employees because an individual refused to waive their rights; and (2) in which an employer sought to enforce provisions of an agreement that violated the OWBPA.  *Id*.  The court thus found it warranted to issue an injunction prohibiting Nucletron from enforcing the invalid portions of the severance agreement, which like Respondent's Waiver, required employees to waive rights to file or participate in EEOC charges.  *Id*. at 595, 597.

10

In *Winchester*, the Court contemplated its own plausible retaliation scenario, observing, "It would be different if WMC revoked the offer upon [the employee's] mere mention of her legal rights . . . . [But because the employee] turned down the deal, WMC's decision not to persist in negotiations does not qualify as an adverse action taken against her." 759 F. App'x at 169 (citations omitted). Hypothetically, if an employee were offered Respondent's Waiver with an offer of possible benefits and merely mentioned his or her legal rights under the ADEA, and Respondent consequently revoked the offer, that revocation would be a clear case of unlawful retaliation under the *Winchester* Court's reading.

Clearly, in conducting its ADEA Directed Investigation, the EEOC may plausibly encounter one or more instances of actual retaliation arising out of the Waiver. As a preventative measure, the EEOC may even choose to educate workers who have received the Waiver about their rights in order to protect them from potential acts of retaliation. Regardless, the EEOC's self-directed inquiry is a proper exercise of its independent investigative authority under the ADEA, and the Court need not look to the merits of such claims. As in *Maritime*, "This is not a case where the agency went rogue or jumped the tracks and sought to investigate something unrelated to its statutory charge." *See* 820 F.3d at 666. The *Maritime* Court observed, "Regular order suggests allowing the EEOC investigation to run its course and reserving judgment on the merits for a later time." *Id*. at 667.

> *(3) The Commission Maintains Its Own, Separate Interest in Preserving Access to ADEA Enforcement Mechanisms Under OWBPA § 626(f)(4).*

Under the OWBPA, EEOC has an independent interest in preventing interference with employee charge-filing and participation in its investigations. The OWBPA, specifically under § 626(f)(4), 29 U.S.C. § 626(f)(4), affords EEOC protected rights that are distinct from protected

11

rights afforded employees under the OWBPA.  When Congress enacted Title II of the OWBPA, amending the ADEA to include § 626(f)(4), it sought to address the specific practice at issue in this matter—employers securing waivers from older employees as they face termination. *See Krane v. Capital One Services, Inc.*, 314 F.Supp.2d 589, 605 (E.D. Va. 2004) (citing S.Rep. No. 101-263 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510).  In doing so, Congress sought to remedy problems endemic to age discrimination, namely, that age discrimination can be difficult to detect, and that older workers encounter more difficulty finding employment after termination than younger workers; thus, older workers "face 'extreme pressure to waive rights,' particularly when a waiver is accompanied by a generous severance package." *Id.* (citing S.Rep. No. 101–79 at 3–17 (1989)).  Accordingly, 29 U.S.C. § 626(f) requires and establishes minimum criteria for waivers to be "knowing and voluntary" when presented to ADEA-protected employees.[6]  Under § 626(f)(4), no waiver may include provisions prohibiting or adversely affecting any individual's right to file a charge or complaint with the EEOC, including to challenge the waiver's validity, or to participate in any EEOC investigation or proceeding.  *See* 29 U.S.C. § 626(f)(4); 29 C.F.R. §§ 1625.22(i)(2)–(3), 1625.23(b).  This "includes, but is not limited to, provisions requiring employees to tender back consideration received, and provisions allowing employers to recover attorneys' fees and/or damages because of the filing of an ADEA suit."  29 C.F.R. § 1625.23(b).

    Respondent argues that a violation of the OWBPA § 626(f)(4) only serves to invalidate a waiver and does not itself constitute an unlawful employment practice, irrespective of an ADEA violation, because the OWBPA provides no independent cause of action for an invalid waiver.

---

[6] These include, but are not limited to, requirements that each waiver be "written in a manner calculated to be understood" by the employee or an average individual and that each waiver "specifically refers to rights or claims arising under" the ADEA (including the OWBPA).  29 U.S.C. §§ 626(f)(1)(A)–626(f)(1)(B); 29 C.F.R. § 1625.22(b)(6). Waivers must be "drafted in plain language" and "must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals." 29 C.F.R. §§ 1625.22(b)(3)–(4).

12

Opposition at 22-23. This misreads the statutes and relevant authorities. As noted, *infra*, the OWBPA requires that waivers be knowing and voluntary *and* prohibits interference with employees' charge-filing and participation rights. After examining the OWBPA's statutory history and the Supreme Court's holding in *EEOC v. Sears, Roebuck, and Co.*, 883 F.Supp. 211 (1995), the court in *Krane* held that, while a violation of 626(f) standing alone, with or without an accompanying ADEA claim, "is not viable, because there is no monetary damage that can flow from a violation of waiver provisions in section 626(f)," under section 626(c), "an employee *can* seek declaratory and injunctive relief for a violation of the OWBPA provisions respecting waivers found in section 626(f)." 314 F.Supp.2d at 609 (emphasis added).

Section 626(f)(4) gives the Commission specific rights, separate from employees. "No waiver agreement may affect *the Commission's rights and responsibilities* to enforce this chapter. No waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Commission." 29 U.S.C. § 626(f)(4) (emphasis added). Unlike § 626(f)(1), which concerns whether a waiver is knowing and voluntary for an employee, under § 626(f)(4), Congress foregrounds the *Commission's* rights and responsibilities. It would be an absurd result for an individual employee to be able to contract away rights that Congress has reserved to the Commission. *See EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) ("[A]n employer and an employee cannot agree to deny to the EEOC the information it needs to advance this public interest.").

This statutory reading is supported by *Wastak v. Lehigh Valley Health Network,* 342 F.3d 281 (3rd Cir. 2003). There, the Court goes to great lengths to sever § 626(f)(4) from the "knowing and voluntary" provisions of § 626(f)(1)–(3). *See id.* at 289–90. The Court in *Wastak* distinguishes § 626(f)(4) from the subsections that precede it to show that a charge-filing ban in violation of §

13

626(f)(4) would not serve to invalidate a waiver under § 626(f)(1). *Id.* at 290. It must conversely hold true, then, that to establish that an employer interfered with the Commission's rights and responsibilities, in violation of § 626(f)(4), one would not need to show separate violations of the "knowing and voluntary" provisions of § 626(f)(1)–(3). One question for EEOC, in conducting its ADEA Directed Investigation, is whether and to what extent Respondent's Waiver has actually interfered with the Commission's rights and responsibilities, in violation of § 626(f)(4). Ultimately, this is a matter for investigation. And if the Waiver has had such an interference effect, then the EEOC should, at minimum, be empowered to seek appropriate injunctive relief.

*(4) Waivers That Restrict Participation Contravene the FLSA and Public Policy.*

Interference with charge-filing rights arguably frustrates the broader purpose of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 209, 211. The Commission's broad investigatory power under the ADEA, 29 U.S.C. § 626(a), arises from that which Congress conferred upon the Department of Labor with the FLSA. Under those standards, the Commission is permitted to investigate and gather evidence "as . . . deem[ed] necessary or appropriate to determine whether any person has violated any provision of this chapter, or which may aid in the enforcement of the provisions of this chapter." 29 U.S.C. § 211(a). The statutory language of the FLSA makes no mention of conditioning the scope of any such investigation on the boundaries of a charge—the only boundary is that which the Commission itself "may deem necessary or appropriate" to determine whether there has been a violation of the ADEA or to otherwise aid in the enforcement of the statute. *See id.* The Supreme Court has opined that substantive rights conferred on private parties and affecting the public interest under the FLSA and EPA cannot be waived if such a waiver would contravene the statutory policy. *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 830–

31 (2019) (citation omitted) (citing *Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603, 605–06 (6th Cir. 2013). Courts have thus concluded that arbitration agreements that interfere with charge-filing rights under the FLSA are unlawful. *See Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013, 1019 (5th Cir. 2015), *aff'd on other grounds sub nom. Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) (citing *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 363 (5th Cir. 2013) (arbitration agreement unlawful if employees would reasonably construe it as prohibiting filing charges)).

Courts have long recognized that filing a charge is a right—and one that cannot validly be waived—since such a waiver is contrary to public policy:

> Allowing the filing of charges to be obstructed by enforcing a waiver of the right to file a charge could impede EEOC enforcement of the civil rights laws. The EEOC depends on the filing of charges to notify it of possible discrimination. A charge not only informs the EEOC of discrimination against the employee who files the charge or on whose behalf it is filed, but also may identify other unlawful company actions.

*EEOC v. Cosmair*, 821 F.2d 1085, 1090 (5th Cir. 1987) (waiver of the "right to file a charge" is void as against public policy) (citing *Shell Oil*, 466 U.S. at 69*; Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1005 (5th Cir. 1969)); *see also EEOC v. Frank's Nursery & Crafts*, 177 F.3d 448, 456 (6th Cir. 1999) (individual may not contract away right to file a charge with the EEOC).

As a natural corollary, courts have found limitations on an employee's ability to assist the EEOC with an investigation to be void as contrary to public policy. "Clearly, if victims of or witnesses to [discrimination] are unable to approach the EEOC or even to answer its questions, the investigatory powers that Congress conferred would be sharply curtailed and the efficacy of investigations would be severely hampered." *EEOC v. Astra USA*, 94 F.3d 738, 744 (1st Cir. 1996) (enjoining employer from enforcing non-assistance covenants). The Supreme Court has emphasized the underlying public policy: "[I]t is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired." *Shell Oil Co.*, 466 U.S. at 69; *see also Astra* ("[A]ny agreement that materially interferes with communication between an employee

15

and the Commission sows the seeds of harm to the public interest."). 94 F.3d at 744 (citation omitted); *Cosmair*, 821 F.2d at 1089 ("The purpose of a charge . . . is not to seek recovery from the employer but rather to inform the EEOC of possible discrimination."). The *Astra* Court observed another potentially absurd result that might obtain from limiting EEOC's charge-receiving powers—that the Commission would need to resort to its subpoena power to conduct investigations, resulting in inefficiencies, as well as increased time and expense. *See* 94 F.3d at 745.

> *(5) Respondent's "Except Where Prohibited by Law" Proviso Does Not Serve to Safeguard Older Workers' Rights or Remedy Plausible Claims.*

Respondent's Waiver is not "knowing and voluntary" under even the most generous reading of the OWBPA, and it imposes conditions that interfere with employees' EEOC charge-filing and participation rights, in violation of the OWBPA. Respondent's use of the limiting proviso, "except where prohibited by law," does not make its provisions valid. A reasonable employee reading the release would be left with little doubt that it limits the employees' right to initiate, assist and participate in EEOC proceedings. Nowhere do the severance terms explain that the waiver of charge filing or the voluntary cooperation in legal proceedings do not apply to EEOC charges. An employee running afoul of Respondent's provisions may be required to pay Respondent "for the costs, including attorney's fees, of defending any such charge." Even with the proviso language, at best, the release is overbroad and ambiguous and has a chilling effect that would deter older workers from fully exercising their rights under the ADEA.

Respondent's release is even more egregious than the release at issue in the *EEOC v. CVS Pharmacy, Inc.* case upon which Respondent relies. *See* 809 F.3d 335, 341 n.2 (7th Cir. 2015). In the CVS release, CVS expressly carved out "the employee's right to participate in a proceeding

16

with any appropriate federal, state or local government agency enforcing discrimination laws." *Id*. at 337 (internal quotation marks omitted).  It was for this reason that the Court found that EEOC's claim would still fail.  Here, there is no explicit carve out.  Respondent argues that by omitting the "except where prohibited by law" language from the scope of information sought in the Subpoena, EEOC has unfairly put Respondent in the position of having to admit to the existence of waivers that lack such a proviso.  Opposition at pp. 25-26.  Respondent's argument is counterintuitive. If a directed investigation into potentially systemic ADEA violations uncovers even more egregiously unlawful conduct, then EEOC has even more reason to seek the requested information. Ultimately, whether the limitation proviso renders the waiver "knowing and voluntary" remains a matter for investigation.

> **D.     Respondent Has Failed to Show that EEOC's Subpoena Poses an Undue Burden.**

*(1) Respondent Has Failed to Establish That the Subpoena Is Unduly Burdensome.*

As with its misrepresentation of EEOC's motives, Respondent mischaracterizes its presentation of the applicable standards and evidence as to undue burdensomeness.  The standard for showing undue burdensomeness is simple.  "The party subject to the subpoena must show that producing the documents would seriously disrupt its normal business operations." *Randstad*, 685 F.3d at 451 (quoting *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 477 (4th Cir. 1986)). Respondent incorrectly avers that a subpoena is unduly burdensome if this business disruption standard is met, *or* if "the cost of gathering the information is unduly burdensome in the light of the company's normal operating costs."  Opposition at 28.  While the cost of gathering the information is "an important factor" to be considered, the disruption of normal business operations is the ultimate test.  *Id*. at 451.  "The burden of proving that an administrative subpoena is unduly

17

burdensome is not easily met." *Id*. (quoting *Maryland Cup*, 785 F.2d at 477) (quotation marks omitted).

Respondent asserts that the declaration of Vice President James Tallaksen, ECF No. 4-13, Tallaksen's Declaration (Oct. 30, 2019), proves that the EEOC's Subpoena would threaten or seriously disrupt Respondent's business operations, but the declaration plainly does not prove this. Admitting that the court in *Randstad* found the subpoena at issue to be within the scope of the EEOC's authority, *see* Opposition at 28-29, Respondent attempts to distinguish *Randstad* from the instant case by claiming that the *Randstad* request was narrower in scope than EEOC's Subpoena, and that the employer evidence was different, because "there, the employer had only provided an *estimate* of how compliance would 'threaten' or 'seriously disrupt' its business operations." *Id*. at 29 (emphasis added). Tallaksen's Declaration does not even provide an estimate of the total cost of compliance, nor of how business operations would be threatened or disrupted. On the contrary, he makes the bare assertion that searching for personnel files would divert Human Resources staff away from 2,250 hours of their ordinary work. ¶¶ 18-19. Tallaksen's Declaration also vaguely and inconsistently describes the actual process by which Respondent will produce the requested information. He first notes that company "electronic systems can be searched for any former employees of SB&D that were offered a severance agreement at or around the time of their termination." ¶ 7. He then asserts that, because there is no electronic record of what terms different severance agreements contain, nor how or when corporate policies vis-à-vis such agreements were amended, compliance with the Subpoena would require a manual search and review of each of approximately 2700 former employees' hard copy personnel files, ¶¶ 11, 16, resulting in the estimated 2,250 hours of work. However, as Tallaksen notes, "*Many* of the personnel files for SB&D's former employees are not stored in electronic format . . ." ¶ 13 (emphasis added). This

suggests that at least *some* of Respondent's personnel files are maintained in electronic format, and Respondent's electronic systems *can* be searched for severance agreement information.

> *(2) Even If Respondent Could Establish That Their Search Would Be Unduly Burdensome, It Is Unclear Whether It Would Be Efficient.*

Respondent's argument echoes that of the employer in *Quad/Graphics*, where the Seventh Circuit affirmed the district court's order enforcing a subpoena, which relied on its finding that the employer had exaggerated its burden by proposing "the most inefficient way in which to collect the requested data." 63 F.3d at 644 (citing *EEOC v. Quad/Graphics, Inc.*, 868 F.Supp. 1078, 1084 (E.D. Wis. 1994)). There, the employer estimated it would require 200,000 employee-hours to gather information on 36,188 job applicants, because it had not recorded the requested information. *Id*. at 648. In that case from nearly 25 years ago, when digital technology was relatively nascent, the employer argued that "unearthing" the requested data "would be a monumental task." *Id*.

Tallaksen seems to rely on the premise that because Stanley Black & Decker, a publicly-traded Fortune 500 company with an annual revenue of $14 billion,[7] maintains its employee policies and records in such a manner as to preclude gaining meaningful information regarding its EEO practices from its databases, conducting a manual review of its records to assess compliance with anti-discrimination law would disrupt its business operations. Assuming this were the case, the EEOC respectfully submits that the Court should order the production of data from Respondent's electronic systems which reveal who were offered a severance agreement at or around the time of their termination and the EEOC be permitted to parse the data and contact former employees, thus alleviating Respondent's burden.

---

[7] *See* Stanley Black & Decker (NYSE: SWK), Investor Presentation (October 28, 2019), *available at* https://ir.stanleyblackanddecker.com/static-files/3c7fd837-06f3-4366-9c0d-fef9fb139d83.

For the foregoing reasons, the Court should enforce the EEOC's Subpoena. The Subpoena seeks information relevant to EEOC's ADEA Directed Investigation, which has potential systemic impact. Respondent has continuously failed to establish that complying with the Subpoena would be unduly burdensome. The Commission therefore urges the Court to enforce the Subpoena, so that EEOC may proceed with its ADEA Directed Investigation.

RESPECTFULLY SUBMITTED,

//s//

Maria Salacuse (Bar ID 15562)
Heather E. Nodler (Bar ID 811561)
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21020
(410) 209-2273
Maria.Salacuse@eeoc.gov
Heather.Nodler@eeoc.gov