**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **U.S. EQUAL EMPLOYMENT** | * | |
| **OPPORTUNITY COMMISSION** | * | |
| | * | |
| **v.** | * | **Civil Action No. CCB-19-2599** |
| | * | |
| | * | |
| **STANLEY BLACK & DECKER, INC.** | * | |

**\*\*\*\*\*\*\*\***

### MEMORANDUM

The Equal Employment Opportunity Commission ("EEOC") moves to enforce an administrative subpoena served on Stanley Black & Decker, Inc. ("SB&D"). (ECF 1). The motion is fully briefed and no oral argument is necessary. Local Rule 105.6 (D. Md. 2018). For the following reasons, the motion will be granted in part and denied in part.

### BACKGROUND

In July 2017, Lonnie Felters, a former employee of SB&D, filed an administrative charge with the EEOC, alleging he experienced racial discrimination during his tenure at SB&D and that he was fired due to his race. (ECF 4-3, Felters Charge). He further alleged that, upon his termination, he was offered an Agreement and General Release that provided for severance pay but, in exchange for the severance, required him to waive his right to file an EEOC charge. Felters alleged that conditioning severance pay on such a waiver was retaliatory and interfered with his rights under "Title VII, the ADA, GINA, EPA, and ADEA." (*Id.*). Felters did not sign the waiver. (*Id.*). On October 5, 2018, the EEOC requested, in connection with its investigation of Felters's charge, *see* 42 U.S.C. § 2000-8(a), that SB&D identify any other employees who had been provided similar releases, copies of the releases, and additional information regarding those employees, including their names, positions, work locations, dates of hire and termination, contact

1

information, and whether they signed the release. (ECF 4-5, Oct. 5, 2018 RFI). SB&D objected to the request, arguing it was overly broad and sought information not relevant to Felters's charge (ECF 4-6, SB&D Nov. 16, 2018, Ltr.). The EEOC responded to this objection with an administrative subpoena, and the agency asserted that its authority included the ability to investigate whether SB&D had a practice of requiring employees to sign an Agreement and General Release that waived their rights to file EEOC charges in exchange for severance pay. (ECF 4-7, EEOC Nov. 28, 2018, Ltr. & Subpoena). SB&D continued to assert that any company-wide information was irrelevant to Felters's individual claims, stating that the "'EEOC can expand its *charges* after uncovering violations during a reasonable investigation,' [but] there is not authority for the EEOC 'expanding its *investigation*' beyond the scope of the charge of the discrimination." (ECF 4-9, SB&D Dec. 10, 2018, Ltr. (quoting *EEOC v. TriCore Reference Labs*, 849 F.3d 929, 939 n.9 (10th Cir. 2017)). On December 4, 2018, the EEOC did initiate a new charge against SB&D focused specifically on the company's compliance with the Age Discrimination in Employment Act ("ADEA"). The EEOC's investigation was to "specifically focus on [SB&D]'s requirement that discharged employees sign a waiver releasing their rights to file any charges with the EEOC in exchange for severance pay." (ECF 4-10, EEOC Dec. 4, 2018 Ltr). In connection with the new charge, the EEOC requested that SB&D:

(1) Identify all employees at any of [SB&D]'s facilities who have been provided an Agreement and General Release which contains a provision that the individual must (a) waive his or her right to file any charge or complaint before any federal, state or local administrative agency and/or (b) "agree not to in any way voluntarily assist or cooperate with any individual or entity in commencing or prosecuting any action or proceeding against Stanley Black & Decker including, but not limited to, any charges, complaints or administrative agency claims[,]" . . . [and]

(2) Submit copies of all releases offered to and/or signed by those identified in number 1.

2

(ECF 1-2 at 12, Dec. 4, 2018, RFI). After SB&D failed to respond to this FRI, the EEOC issued a second subpoena in connection with the new charge on March 18, 2019, which seeks the same information. (ECF 1-2 at 14–16, Mar. 18, 2019 Subpoena). On April 2, 2019, SB&D petitioned the EEOC to revoke the subpoena. (ECF 1-1). It is this subpoena that the EEOC asks the court to enforce.

## DISCUSSION

"The district court plays a 'limited' role in the enforcement of administrative subpoenas." *EEOC v. Maritime Autowash, Inc.*, 820 F.3d 662, 665 (4th Cir. 2016) (quoting *EEOC* v. *City of Norfolk Police Dep't*, 45 F.3d 80, 82 (4th Cir. 1995)). In determining whether the subpoena should be enforced, the court is not to analyze the underlying claim on its merits; rather the EEOC need only demonstrate that "(1) it is authorized to make such investigation; (2) it has complied with statutory requirements of due process; and (3) the materials requested are relevant." *EEOC v. Randstad*, 685 F.3d 433, 442 (4th Cir. 2012) (quoting *Norfolk Police*, 45 F.3d at 82). If these requirements are met, "the subpoena should be enforced, unless the party being investigated demonstrates that the subpoena is unduly burdensome." *Id.* Here, SB&D argues the EEOC has abused its authority in requesting the materials at issue and that its request is overbroad and unduly burdensome.

## I.     Authority to Investigate

The EEOC is empowered by Congress to investigate potential violations of the ADEA on its own accord and, in furtherance of its investigatory powers, to require by subpoena the production of documentary evidence "relating to any matter under investigation." 29 U.S.C. § 626(a); 15 U.S.C. § 49, incorporated in Section 9 of the Fair Labor Standards Act (FLSA), as amended, 29 U.S.C. § 209 and, through that section, in Section 7(a) of the ADEA, 29 U.S.C.

§ 626(a). The EEOC argues its request is clearly within its statutory authority under 29 U.S.C. § 626(a) because it seeks the identities of former SB&D employees who were provided with an agreement and general release which contained a provision that required them to waive the right to file a charge in exchange for severance, in order to determine whether the provision of the release violated the ADEA and, if so, who has been aggrieved by such violation. SB&D makes two arguments in response. First, it argues the EEOC's subpoena is an abuse of its broader investigatory authority under the ADEA because it is solely an attempt to gain information to support Mr. Felters's earlier individual charge. Second, SB&D contends that the EEOC's request does not seek information that pertains to a plausible unlawful employment practice under the ADEA, because merely offering the releases at issue to employees is not "facially retaliatory." The court addresses each argument in turn.

### a.  Bad Faith or Improper Purpose

In SB&D's view, the EEOC's request is not an "autonomous" investigation of SB&D's potential violations of the ADEA, but is an end-run around its more limited authority to investigate Mr. Felters's original individual charge. Under Title VII, "in connection with any investigation of a charge" filed by an aggrieved person on a member of the EEOC, the EEOC is entitled to seek documentary evidence that "is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984) (under Title VII, "the EEOC's investigative authority is tied to [the] charges filed with the Commission"). The EEOC's authority pursuant to the ADEA, however, contains no charge-based relevancy requirement; the agency may conduct investigations into potential ADEA violations at its discretion and may seek records "relating to any matter under investigation," 29 U.S.C. § 626(a); 15 U.S.C. § 49; *see also EEOC v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 303 (4th Cir. 1992). SB&D's contention is that when it pushed

4

back on the EEOC's subpoena pursuant to the Felters charge, which sought company-wide information regarding employee releases, the EEOC filed a new ADEA charge directed at nationwide activity and issued the instant subpoena in bad faith in order to further its original investigation. Thus, SB&D argues the EEOC should be limited by the original Felters charge and should be entitled to seek only information relevant to his individual claims.

The court sees no evidence of bad faith in this matter. As SB&D acknowledged in its own correspondence to the EEOC, the EEOC may expand its charges after a reasonable investigation. *See, e.g.*, *EEOC v. TriCore Reference Labs*, 849 F.3d 929, 939 n.9 (10th Cir. 2017). Based on information obtained in the course of its investigation of Felters's charge, the EEOC submits that it believes SB&D may have a systemic policy of using the releases at issue to deter its employees from filing charges of discrimination and cooperating in EEOC investigations. "[T]he agency may receive information concerning alleged violations of the ADEA 'from any source,' and it has independent authority to investigate age discrimination." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (citing 29 C.F.R. §§ 1626.4, 1626.13).

The cases cited by SB&D are instructive. In *EEOC v. McLane Co.*, No. CV-12-615-PHX-GMS, 2012 WL 1132758 (D. Ariz. Apr. 4, 2012) an employee initiated an EEOC charge of gender discrimination based on a physical capability test used by the defendant. *Id.*, at *1. The EEOC opened a new charge pursuant to its authority under the ADEA and subpoenaed the personal information of every person who took the test, including their name, gender, and contact information, along with other information about the tests. Because the subpoena requested wide-ranging personal information that was not relevant to the investigation of any potential age discrimination claim, such as gender, and given the initiation of a prior Title VII charge for gender discrimination only, the court understood the subpoena to be "fishing" for evidence related to that

individual charge, which did not allege age discrimination. *Id.* at *5. But in *EEOC* v. *Performance Food Grp. Co., LLC*, No. CV MJG-09-2200, 2010 WL 11570678 (D. Md. Feb. 18, 2010), after individuals initiated EEOC charges against a company for sex discrimination under Title VII, the EEOC opened a separate Equal Pay Act investigation into the company. *Id.*, at *1. The EEOC issued virtually identical subpoenas under each investigation, requesting human records data and compensation data. The defendant argued that the EEOC was attempting to obtain data in response to the EPA subpoena to support the Title VII investigation. Where the record showed that there were allegations of gender discrimination in compensation, the court concluded that the EPA subpoena had an independent basis and was not issued solely in an attempt to circumvent the limitations imposed on the agency's Title VII authority. *Id.*, at *4.

This case is more analogous to the circumstances presented in *Performance Food Group* than in *McLane*. As in *Performance Food Group*, the EEOC here has shown a basis for an investigation into potential ADEA violations and has issued a subpoena for information relating to that investigation. *Id.* at *4. The agency has not, as it did in *McLane*, sought to tailor its subpoena under the ADEA charge to obtain information unrelated to potential ADEA claims. *McLane*, 2012 WL 1132758, *5. For instance, the request does not seek irrelevant information regarding Felters's complaints of racial discrimination. That there is great overlap between the allegations underlying both charges appears to stem from the fact that the EEOC learned of the potential systemic issue from Felters's individual charge and not from any apparent improper purpose on the EEOC's part to fish for information that is relevant only to Felters's claims. SB&D has presented no authority

that suggests the EEOC may not initiate a new charge based on information learned of from another charge.[1]

### b.  Statutory Basis for ADEA Investigation

SB&D further argues that the EEOC's investigation seeks records of all employees offered a release as part of an investigation of "facial retaliation" that is not an arguable or plausible unlawful employment practice in this Circuit, citing *EEOC v. Nucletron Corp.*, 563 F. Supp. 2d 592, 598 (D. Md. 2008) and *David v. Winchester Med. Ctr.*, 759 F. App'x 166 (4th Cir., Jan. 11, 2019).

In *Nucletron*, the employer required its employees to sign a severance agreement upon termination in order to receive severance benefits. The agreement contained a provision that required the employee to promise not to file any charge relating to their employment with any federal agency nor to participate in any such action. 563 F. Supp. 2d at 595. The EEOC sued the employer on behalf of an employee who refused to sign the agreement and received no severance benefits, *Id.* at 596. The EEOC asserted two theories of retaliation—first, that the offer of the agreement, regardless whether the employer sought to enforce the agreement or whether the employee filed an agency charge was "facially retaliatory," and second, that the employer retaliated against the employee by withholding severance benefits promised to all terminated employees for his refusal to sign the agreement containing the release. *Id.* at 597. The district court, relying on the Court of Appeals for the Sixth Circuit in *EEOC v. SunDance Rehab Corp.*, 466 F.3d 490 (6th Cir. 2006), held that the offer of the agreement alone, though it contained an

---

[1] Other authorities cited by SB&D suggest that the EEOC may not use an employee's individual charge brought under Title VII to broadly investigate a company's nationwide practices absent the proper filing of a separate Commission-initiated pattern and practice charge. *See, e.g.*, *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 762 (11th Cir. 2014)*EEOC v. Burlington N. Santa Fe R.R.*, 669 F.3d 1154; 1159 (10th Cir. 2012); *EEOC v. Southeast Food Services Company, LLC*, No. 3:16-MC-46-TAV-HBG, 2017 WL 2728422 (E.D. Tenn. June 23, 2017), adopting report and recommendations at 2017 WL 1155040 (E.D. Tenn. March 27, 2017). But these cases do not suggest that the EEOC's authority under an ADEA charge is limited if it was informed by, but is distinct from, a prior Title VII charge.

unenforceable provision requiring the employee to waive its right to file an employment-related administrative charge, did not constitute retaliation because the offer was insufficient by itself to show an adverse action by the employer. *Id.* at 598–99. But the court recognized two theories under which the offer of the agreement could constitute retaliation—where the employer "denies severance benefits that are otherwise promised or owed or if the employer sues to enforce the agreement." *Id.* at 599. Because the EEOC plausibly alleged that the benefits offered to the employee were part of a standard and not discretionary severance package promised to all terminated employees, the court permitted the EEOC to develop that retaliation claim through discovery. *Id.* at 599–600.

In *David*, an employee brought a retaliation claim under the ADEA, arguing that when she tried to negotiate her severance agreement and attempted to assert rights under various discrimination statutes, the employer withdrew the offer of a severance payment. 759 F. App'x at 169. The Fourth Circuit Court of Appeals found that the employer had not withdrawn its offer; rather, the employee had declined it, and the employer simply accepted the rejection and declined to initiate further negotiations. Citing *SunDance*, the court observed that "[t]here is no adverse employment action when an employer declines to pay discretionary severance benefits because a terminated employee 'refused to sign' a separation agreement." *Id.*

SB&D argues these two cases demonstrate that the EEOC's investigation, which is specifically focused on SB&D's "requirement that discharged employees sign a waiver releasing their rights to file any charges with the EEOC in exchange for severance pay" is geared toward investigating the mere offer of a waiver in exchange for severance pay, which cannot plausibly be considered retaliatory under the ADEA. The EEOC counters that *David* is not binding precedent, that its subpoena is at any rate related to an investigation into practices recognized as retaliatory

in *Nucletron*, and that it has the independent authority to seek injunctive relief against a waiver that violates the OWBPA.

The court is not persuaded that the EEOC's subpoena is beyond its authority to investigate unlawful practices under the ADEA. "To establish its authority to investigate, the EEOC need only present an 'arguable' basis for jurisdiction." *Randstad,* 685 F.3d at 442 (quoting *Norfolk Police*, 45 F.3d at 85). The Fourth Circuit has been very clear that to do so, the EEOC is not required to show a "viable cause of action or remedy at the subpoena enforcement stage." *Maritime Autowash*, 820 F.3d at 666–67 (holding that EEOC subpoena seeking employment data related to individual complainant alleging national origin discrimination and similarly situated employees was enforceable, despite the employer's argument that the employee was not authorized to work in the U.S. and thus precluded from Title VII relief). The court's review at this stage is limited to ensuring that the agency is not seeking to investigate conduct "only speculatively related to" its statutory authority. *Id.* at 668. "[A]ny effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error." *Randstad*, 685 F.3d at 449.

In this case, the EEOC seeks the identity of all employees of SB&D who have been provided a release containing a provision requiring them to waive their right to file an agency charge and to agree not to cooperate with any proceeding against SB&D and copies of the releases offered to or signed by those employees. This information is more than "speculatively" related to the EEOC's authority to investigate potential ADEA violations. While there is strong persuasive authority against the theory that the releases at issue are "facially retaliatory," the EEOC is correct that there is no binding precedent that forecloses such a claim, and *Nucletron* itself makes clear that requiring employees to sign such releases in exchange for severance pay may constitute

retaliation under the ADEA in at least two circumstances—where the employer enforces the release and if severance is a standard benefit and not discretionary. 563 F. Supp. 2d at 599–600.

SB&D argues that the EEOC's consistent attention to the issue of "facial retaliation" in its correspondence to SB&D and its unwillingness to consider SB&D's offer of a limited response that includes only employees who fall within the two scenarios described in *Nucletron* demonstrates that the agency is interesting in pursuing only a legal theory that is foreclosed and materials relevant only to that theory. There are two problems with this argument.

First, because there is no binding precedent on the issue in this circuit, a determination here that the EEOC cannot pursue an *investigation* let alone a lawsuit regarding "facial retaliation" would "cram substantive questions of statutory coverage into the confines of subpoena enforcement." *Maritime Autowash*, 820 F.3d at 667. The substantive argument SB&D raises that offering its employees the release at issue is not retaliation is more appropriately a defense to a suit that has not been, and may never be, brought. As the Fourth Circuit has noted, "[w]ithout evidence, a record, and appropriate briefing" the court is not equipped at this stage "to conduct full-blown merits review" before the EEOC itself has determined whether its charge is valid and whether it will pursue further action. *Id.; see also NLRB v. Raleigh Rest. Concepts, Inc.*, No. 5:15-CV-438-D, 2016 WL 4360914, at *3 (E.D.N.C. Aug. 12, 2016) (NLRB had authority to investigate charge where there was no controlling precedent and there was a circuit split concerning its allegation that a mandatory class action waiver violated the NLRA).

Second, that the EEOC is interested in pursuing a theory of "facial retaliation" does not indicate that is the only type of violation it seeks to investigate; indeed in *Nucletron*, the agency pursued multiple theories of retaliation against the employer. 563 F. Supp. 2d at 597. And seeking the identities of the employees who have been offered the release is clearly relevant to an

10

investigation into other potentially retaliatory acts, including whether SB&D has ever enforced a release against such an employee, particularly if the agency desires to seek such evidence from a source other than the company itself. *See EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984) (EEOC is entitled to access "virtually any material that might cast light on the allegations against the employer"). The court believes it would be reversible error to assess at this early stage, before the EEOC has completed its investigation, the precise contours of its inquiry and whether the legal theories it may or may not pursue will ultimately succeed in a judicial proceeding. *See Maritime Autowash*, 820 F.3d at 667.

In sum, as in *Maritime Autowash*, "[t]his is not a case where the agency went rogue or jumped the tracks and sought to investigate something unrelated to its statutory charge." *Id.* at 666. The EEOC's subpoena seeks information related an investigation plausibly within its delegated powers and thus is not unenforceable for lack of authority.[2]

## II.   Overbreadth and Undue Burden

Finally, SB&D contends the subpoena is overbroad and unduly burdensome because it lacks a reasonable temporal or geographic scope and would impose an unreasonable time cost on SB&D. "The burden of proving that an administrative subpoena is unduly burdensome is not easily met." *Randstad*, 685 F.3d at 451 (quoting *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 477 (4th Cir. 1986)). It requires a showing, based on the particular facts of the case, that "producing the documents would seriously disrupt . . . normal business operations." *Id.* In assessing the cost of

---

[2] SB&D further contends that it is not required to respond to the subpoena as written because it is argumentative in that it omits from the quoted language of the Agreement and Release other portions of the release which SB&D believes makes the document lawful to provide to employees. (ECF 4 at 25). The court understands this as a further argument regarding the merits of the EEOC's charge and will not refuse to enforce the subpoena on this basis. The EEOC's charge is that with or without the "except where prohibited by law" language, the Agreement & Release may violate the ADEA, so it is no defense to the subpoena that SB&D may have to produce agreements that may not contain such language. Agreements & Releases that contain the language quoted in the subpoena are responsive to the request whether or not they contain additional language.

the production, the court should take into consideration the company's normal operating costs.

*Id.*

      SB&D's evidence of burden is a declaration by James Tallaksen, SB&D's vice president for labor and employee relations. (ECF 4-13, Tallaksen Decl.). Tallaksen avers that SB&D is able to use an electronic system to search for any former employees of SB&D who were offered a severance agreement at the time of termination. (*Id.* ¶ 7). But because not all records are in electronic form, the system will not necessarily provide any information regarding the content of the agreement proposed to any particular employee.[3] (*Id.* ¶ 9). Apparently (and curiously), SB&D has no record of when it has made changes to its severance agreements, thus necessitating a manual review of the personnel file for each employee to determine whether the agreement included the language described in the subpoena. (*Id.* ¶¶ 10, 11). Tallaksen estimates that completing such review would take an average of fifty minutes per employee, and that at least 2,700 employees were offered severance agreements, meaning that the subpoena would require 2,250 hours of human resources staff time. (*Id.* ¶¶ 16–17). Tallaksen does not estimate the cost of this endeavor in light of SB&D's normal operating costs, but asserts that "diverting any one of [the company's] employees awa[y] from their normal HR functions would severely inhibit SB&D's ability to manage its workforce, and prevent SB&D from timely addressing the varying needs of its employees." (*Id.* ¶ 18).

      The Fourth Circuit has expressed a high degree of skepticism of affidavits from employers that estimate the cost of compliance without comparing the effort to the company's operating costs or specifically relating *how* its functions would be disrupted. For example, in *Randstad*, an employer estimating that gathering the information responsive to an EEOC subpoena would

---

[3] It is not obvious from the declaration whether this is true for all employees.

consume at least 40 hours of three employees' time and cost between $14,000 and $19,000. 685 F.3d at 451. Because the company did not proffer evidence of its normal operating costs in comparison to the cost of compliance or provide other information suggesting that compliance would seriously disrupt its business functions, the court concluded that the evidence was "insufficient as a matter of law to support a finding that the costs of compliance rise to the level of an undue burden." *Id.* at 452. Similarly, in *Maryland Cup Corp.*, costs of compliance of $75,000, in 1986, were not shown to be unduly burdensome where the company presented no information regarding its normal operating costs or other disruptions it might face. 785 F.2d at 479.

Here, SB&D does not contextualize the hours it asserts compliance will require with information regarding its operating costs or other information that would allow the court to evaluate whether the request will truly inhibit the company's HR functions or whether a more limited production would significantly reduce the asserted burden. For example, SB&D does not indicate the number of offices or employees over which the tasks associated with production could be spread or whether limiting the initial production to a particular region (e.g., the company's Mid-Atlantic offices), *see EEOC v. Sears, Roebuck and Co.*, No. CIV.A10CV00288WDMKMT, 2010 WL 2692169, at *7 (D. Colo. June 8, 2010), or to a particular time period (e.g., December 2016 to December 2018, the focus of the EEOC's Notice of Charge (*see* ECF 4-10, Notice of Charge)) would significantly reduce the asserted burden of compliance. At the same time, the court recognizes that the total time SB&D estimates for compliance with the subpoena is significant. The court will therefore request that the parties confer and within twenty-one days propose to the court an agreed-upon scope for SB&D's production that may be limited to reduce any burden on SB&D, recognizing that the EEOC may seek further production at a later time, if justified. If the parties are unable to agree to the scope of the production, the parties may each provide position

statements regarding its appropriate scope, and SB&D must, if it continues to assert that compliance poses an undue burden, show in more detail that compliance would "seriously disrupt . . . normal business operations," taking into consideration its normal operating costs. *Randstad*, 685 F.3d at 451.

**CONCLUSION**

For the foregoing reasons, the court will grant in part and reserve in part the EEOC's application to enforce the administrative subpoena served on SB&D. SB&D has not shown cause for failing to comply with the subpoena in its entirety, but the court will reserve ruling on the issue whether the subpoena should be enforced in full or whether the scope of the subpoena, as drafted, poses an undue burden on SB&D. The parties will be directed to confer and, within twenty-one days, submit to the court either a joint proposal as to the scope of SB&D's production or, if an agreement cannot be reached, separate position statements as to the same. A separate Order follows.

     5/17/2021                                                    /S/
Date                                                    Catherine C. Blake
                                                        United States District Judge

14